Filed 7/13/16  P. v. The North River Ins. Co. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>THE NORTH RIVER INSURANCE COMPANY, et al.,<br><br>  Defendants and Appellants. | F071965<br><br>(Super. Ct. No. 1477055)<br><br>**OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Stanislaus County.  Marie Sovey Silveira, Robert B. Westbrook and Shawn D. Bessey, Judges.

Jefferson T. Stamp for Defendants and Appellants.

John P. Doering, County Counsel, and Robert J. Taro, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Defendant surety, The North River Insurance Company (North River), and its bail agent, real party in interest Bad Boys Bail Bonds (Bad Boys) (collectively appellants), appeal from two trial court orders:  (1) the May 7, 2015 order denying Bad Boys' motion to exonerate a bail bond based on criminal defendant Wiley Brooks' incarceration in Oregon, and (2) the May 26, 2015 order, issued on Brooks' first appearance in Stanislaus

County Superior Court, which required the payment of the costs the People incurred in returning Brooks to custody prior to exoneration of the bond pursuant to Penal Code section 1306, subdivision (b) (hereafter section 1306(b)).[1]

Appellants contend (1) the trial court was without jurisdiction to order bail forfeited; (2) the trial court lost jurisdiction when it refused to grant the request for exoneration on May 7; and (3) the trial court exceeded its jurisdiction when it awarded costs. Finding no merit to appellants' contentions, we affirm the trial court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2014, Wiley Brooks was charged with pimping (§ 266h, subd. (a)). At an August 5, 2014 arraignment, at which Brooks appeared in custody, the trial court entered his not guilty plea and denial of the priors, set his bail at $30,000 and set the next hearing for August 11, 2014. On August 8, 2014, North River, through its agent Bad Boys, executed a bail bond. In doing so, North River agreed to undertake that Brooks would appear in court on August 11, 2014, and thereafter hold himself amendable to the orders and process of the court.

On August 11, 2014, Brooks appeared before Judge Marie Sovey Silveira for the first time. The trial court stated on the record: "You're here on 1477055. Ms. Jennison represents you and Ms. Rees represents the People. There is a request to continue your case for two months. I would set it on October 10, 2014, 8:30 in the morning, if you consent. [¶] You do [] have a right to a preliminary hearing within 10 court, 60 actual days of your arraignment and promptly after that. [¶] Do you waive time?" Brooks answered, "Yes[,]" and the hearing concluded.

Brooks did not appear at the October 10, 2014 hearing before Judge Silveira. The trial court stated that Brooks was ordered to be there that day and it had received information that Brooks was not present because he was in custody in Oregon on new

---

[1] Undesignated statutory references are to the Penal Code.

crimes. The trial court declared the bond forfeited and issued a bench warrant in the amount of $100,500. Notice of forfeiture was mailed to North River and Bad Boys on October 14, 2014.

On March 16, 2015,[2] the Stanislaus County District Attorney's Office (district attorney) received a letter from Brooks in which he stated that he was incarcerated at the Oregon State Penitentiary (OSP) with a release date, at the earliest, of September 10; prison staff had notified him of a detainer in the Stanislaus County case; and he failed to appear at the hearing in Stanislaus County because he was in custody in Oregon, but he would have appeared had he not been incarcerated. Brooks asked the district attorney or the trial court to give him a court date, sanction him in absentia, or run his time concurrent with his Oregon sentence. Brooks stated he was unable to transfer to a minimum security facility because the detainer increased his custody level, but he could be transferred if the detainer were dismissed. Brooks enclosed a completed form entitled "Notice and Demand for Trial[,]" in which he demanded a hearing and trial on the Stanislaus County charges as prescribed by section 1381.

District attorney investigator Gary J. Martinez reviewed Brooks' case and determined the case was still in active bail bond forfeiture status. The district attorney began processing Brooks' section 1381 demand. On March 17, Senior Deputy District Attorney Michael D. Houston submitted a declaration and order for production pursuant to Brooks' section 1381 demand, which stated that Brooks was in custody at OSP and his presence was needed for further proceedings in Stanislaus County. The next day, Judge Silveira signed the order for production, which directed the Stanislaus County Sheriff to proceed to OSP, obtain custody of Brooks, and transport him to the Stanislaus County jail. The order further stated: "Bail Bond Forfeiture. Matter subject to costs per Penal Code section 1306(b) upon return of defendant to Stanislaus County." The declaration

_____

[2] References to dates are to the year 2015, unless otherwise stated.

and order were filed on March 19, but there is no indication in the record that the documents were served on North River or Bad Boys.

On March 31, Martinez was advised that the Oregon State Governor's Office would not honor the section 1381 court order because under the Interstate Agreement on Detainers (IAD), OSP was responsible for initiating Brooks' return to Stanislaus County. The next day, Martinez provided OSP with the information needed to effect Brooks' return. The district attorney received the completed IAD forms from the Oregon Department of Corrections on April 13.

On April 10, Bad Boys filed a motion to toll time on the bond forfeiture pursuant to section 1305, subdivision (e), due to Brooks' incarceration in Oregon. Bad Boys asked the trial court to toll time during the period of temporary disability, as section 1305, subdivision (e) requires tolling while Brooks remained in custody in state prison, and it and North River were entitled to a reasonable period of time after cessation of the disability to return Brooks to the court's jurisdiction. Bad Boys further asserted that if the district attorney elected not to extradite Brooks, the bond should be exonerated pursuant to section 1305, subdivision (f). Investigator Amanda Mosher stated in a declaration filed in support of the motion that she confirmed with the Oregon authorities that (1) Brooks was booked into the Benton County jail on September 10, 2014, (2) he was transferred to the Oregon Department of Corrections on November 13, 2014, and (3) his earliest release date was September 10. The County Counsel's office filed a notice of non-appearance and non-opposition on Bad Boys' motion.

On April 15, Martinez sent an email to Edie Neil, which was cc'd to Bad Boys' attorney and other individuals. The email's purpose was to inform the court that the section 1381 demand order was no longer valid, as OSP refused to honor the order and the order had expired on April 9, and an OSP staff member told Martinez that Brooks instead should have applied for a return to Stanislaus County through OSP. The staff member stated that OSP would file the proper IAD documents on Brooks' behalf, so he

4.

would be returned before his Oregon sentence ended. Martinez stated that OSP was in the process of completing the necessary forms, and asked Neil to place a copy of the email in the court's file so all parties were aware of the current status of Brooks' return.

On April 21, Chief Deputy District Attorney Dave Harris signed the IAD forms in which he accepted temporary custody of Brooks for the purpose of bringing him to trial. The form stated that Brooks would be taken into custody at OSP on or about May 18 for delivery to Stanislaus County. Harris designated Modesto Police Department (MPD) officers Larry Meyer and Joe Olvera as the agents responsible for delivering Brooks to Stanislaus County. The next day, Judge Linda McFadden signed the form in which Harris agreed to take temporary custody of Brooks.

On April 21, Bad Boys' attorney issued a subpoena to the Office of the District Attorney for an appearance in person and production of (1) all of Brooks' arrest or detention records in Benton County, Oregon, and OSP, (2) all records of any extradition decision by the district attorney, and (3) all communications between the district attorney's office and Oregon law enforcement. The attorney believed the documents would show the district attorney's office was informed of Brooks' arrest and detention in Oregon on or about October 10, 2014, and elected not to extradite, which would exonerate the bond pursuant to section 1305, subdivision (f).

On May 1, Harris filed a motion to quash the subpoena. He argued the subpoena was defective because (1) no identifiable person was subpoenaed, (2) it was a civil subpoena used in a criminal proceeding, and (3) if a civil subpoena was appropriate, it was invalid for failing to comply with the Government Code. Harris also asserted there was no motion pending before the court that required an extradition election, such as a motion brought under section 1305, subdivisions (f) or (g), and therefore discovery was premature. Finally, Harris stated that "more importantly, [Brooks] is being transported back to Stanislaus County rendering any discovery moot."

5.

The motions to toll time and quash the subpoena were heard on May 7 by Judge Robert B. Westbrook. County counsel stated the County did not object to the request to extend time. The trial court said it would sign the orders and wondered if the subpoena was even relevant. Bad Boys' attorney then made an oral request for exoneration of the bail under section 1305, subdivision (d). The attorney asserted that because Brooks was being transported back to Stanislaus County, he was permanently in custody until his return to court by law enforcement. Bad Boys was concerned whether the district attorney had made a formal request for extradition or what the legal mechanism for Brooks' return was, but its position was that "exoneration of the disability" was permanent if Brooks was being transported to the court by law enforcement. County counsel responded that he did not have any information regarding Brooks' current status and whether he remained in custody or was being transported.

The trial court stated it did not know the answer to Bad Boys' attorney's question, but it was likely a bench warrant had been issued in this matter "which, were he released from whatever time he's doing up there in Oregon, it's likely he would be held on the warrant until brought here." The trial court said it was going to find there was a temporary disability in getting Brooks there, as he was in custody, and it would toll the time on the forfeiture for six months. The trial court confirmed that the bench warrant remained in place. The trial court signed an order granting Bad Boys' motion to toll the forfeiture of the bond pursuant to section 1305, subdivision (e), which stated that the 180-day appearance period was tolled until November 9.

On May 14, Martinez asked Officer Meyer to provide him with the estimated section 1306(b), costs to return Brooks to their custody so Martinez could provide the cost estimate to Bad Boys' attorney and its corporate staff in advance. Meyer estimated the costs to be $3,806.41.

On May 18, Martinez notified Bad Boys' attorney, its corporate staff member Rose Martinez, and its general manager Robert Venn, by email of the estimated costs.

6.

Martinez stated that per their previous email conversation on May 12, he was providing Bad Boys "pre-notice" of the estimated Modesto Police Department section 1306(b) costs related to Brooks' return from OSP, which may be subject to change upon actual transport and booking of Brooks. Martinez stated that his "D.A. Administrative Costs" were not included, and he would notify them at a later time that week of the actual costs. Martinez advised that the officers intended to transport Brooks that week, but due to operational security, the district attorney would not disclose the airline, destination, date or time the flight was due. Martinez further advised that Brooks' matter could be calendared in Stanislaus County Superior Court from May 21 forward, and they could contact the clerk's office for scheduling or look it up online. Martinez encouraged Bad Boys to check the court calendar periodically after Brooks' booking to secure an accurate appearance date. Martinez stated that neither County counsel nor the district attorney knew when the trial court would schedule Brooks' first appearance, but they intended to ask the trial court for section 1306, subdivision (c) costs at that appearance. Attached to the email was a Modesto Police Department "Extradition/Transfer Expense Claim Form" which described the expenses and listed the estimated costs.

The officers completed the actual transport of Brooks from OSP and booked him into Stanislaus County jail on May 20. Meyer emailed Martinez notification of the actual section 1306(b) costs of $3,834.93 incurred in returning Brooks to custody. The actual costs were $28.52 higher than the estimated ones, and included the officers' hourly rate and benefits, airfare for the officers and Brooks, mileage from Modesto to the Sacramento airport, rental car and fuel, hotel and food.

On May 21, Martinez prepared a calculation of his administrative costs required to monitor and manage Brooks' return, which totaled $141.28. That same day, he emailed Bad Boys' attorney, Venn and Rose Martinez, at approximately 8 a.m., and advised them that the Modesto Police Department transported Brooks from OSP and booked him into the County jail on May 20, and section 1306(b) costs totaling $3,976.21 were incurred in

7.

returning Brooks to their custody, and managing and monitoring his return. Martinez stated that a motion and declaration of costs would be filed that day, and Brooks' tentative court date was scheduled for May 21 at 1 p.m.

The district attorney filed the motion for costs on May 21, which stated the People were moving for an order of costs pursuant to section 1306(b); the hearing date was set for May 26. The People asked the trial court to order costs prior to exoneration of the bond, as they were entitled to relief for the costs of returning Brooks to custody. The motion was served by mail on appellant's attorney on May 21. Attached to the motion was Martinez's declaration, which set out the above facts and asked that on Brooks' first appearance, the court grant a conditional order of exoneration upon payment of costs in the amount of $3,976.21 pursuant to section 1306(b).

Brooks was present in custody at the May 26 hearing before Judge Shawn Bessey. Brooks' attorney and the district attorney were present, but no one appeared on behalf of North River or Bad Boys. The trial court first addressed the "exoneration of bond and requests for costs." The trial court stated it was shown "that the bond company through the surety was served," and asked the district attorney if she wanted to provide any additional information. After the district attorney said she did not, the trial court ordered the bond exonerated on condition of paying costs. Since the surety was noticed, the trial court ordered $3,976.21 as costs. That same day, the trial court signed the following order: "Good cause appearing, IT IS ORDERED that Defendant pay costs of $3,976.21 prior to exoneration of this bond." On May 27, the clerk mailed the minute order of the May 26 hearing regarding costs to appellants.

On June 5, appellants filed their notice of appeal from the May 7 order denying the motion to exonerate the bond and the May 26 order awarding costs.

## DISCUSSION

Appellants challenge three orders on appeal: (1) the October 10, 2014 forfeiture of the bond; (2) the May 7 denial of its oral motion for exoneration; and (3) the May 26 award of costs.

"Certain fixed legal principles guide us in the construction of bail statutes. The law traditionally disfavors forfeitures and this disfavor extends to forfeiture of bail. [Citation.]  Thus, sections 1305 and 1306 must be strictly construed in favor of the surety to avoid the harsh results of a forfeiture." (*People v. Surety Ins. Co.* (1985) 165 Cal.App.3d 22, 26.)  "The standard of review, therefore, compels us to protect the surety, and more importantly the individual citizens who pledge to the surety their property on behalf of persons seeking release from custody, in order to obtain the corporate bond." (*County of Los Angeles v. Surety Ins. Co.* (1984) 162 Cal.App.3d 58, 62.)  "Bail forfeiture statutes are jurisdictional and, if not strictly followed, the court loses jurisdiction to later declare a forfeiture of the bond." (*People v. Bankers Ins. Co.* (2009) 171 Cal.App.4th 1529, 1532.)

"Ordinarily, appellate courts review an order denying a motion to vacate the forfeiture of a bail bond under an abuse of discretion standard.  [Citation.]  When the appellate court is deciding only legal issues, however, such as jurisdictional questions and matters of statutory interpretation, the abuse of discretion standard does not apply. [Citation.]  When the facts are undisputed and only legal issues are involved, appellate courts conduct an independent review." (*People v. International Fidelity Ins. Co.* (2012) 204 Cal.App.4th 588, 592.)

In this case, the facts are undisputed, the only issues presented are legal, and we conduct an independent review.  We address each of appellants' arguments in turn.

*The October 10, 2014 Hearing*

Section 1305, subdivision (a) authorizes the trial court to declare a forfeiture of bail if the defendant fails to appear for arraignment, trial, judgment, or "[a]ny other

9.

occasion prior to the pronouncement of judgment if the defendant's presence in court is lawfully required."

Appellants contend that the October 10, 2014 hearing was not one of the so-called mandatory hearings at which a defendant is "lawfully required" to appear even without a specific court order. From that predicate, appellants argue Brooks' presence in court at that hearing could have lawfully been required within the meaning of the bail forfeiture statutes only if there was " 'a specific court order commanding his appearance at a date and time certain' " (*People v. Ranger Ins. Co.* (1992) 6 Cal.App.4th 1301, 1304), and because the reporter's transcript of the August 11, 2014 hearing does not reflect a specific order for Brooks to appear at the October 10, 2014 hearing, Brooks' nonappearance at that hearing could not support a bail forfeiture order.

After the parties filed their appellate briefs, our Supreme Court published its decision in *People v. Safety National Casualty Corp.* (2016) 62 Cal.4th 703 (*Safety National*), which we are satisfied controls here. In *Safety National,* the defendant (Bent) was released on bond and appeared at several hearings. At his arraignment hearing, the trial court entered Bent's plea of not guilty, and also set a pretrial conference date. Bent appeared at the pretrial conference, where the parties " 'agreed to put the case over' " to a new date, and the trial court stated " 'bail will stand.' " When Bent did not appear at the agreed upon date, the court ordered bail forfeited. (*Id*. at p. 708.)

The Court held that section 977, subdivision (b)(1), which provides that a felony defendant must be present at five specified proceedings and at "all other proceedings" unless he or she has properly executed a written waiver, gives rise to a "lawfully required" appearance under section 1305, subdivision (a). (*Safety National*, *supra*, 62 Cal.4th at pp. 707-708.) "Therefore, unless a defendant has properly executed a written waiver of personal presence (§ 977(b)), or has a 'sufficient excuse' for his or her absence at any scheduled proceeding (§ 1305), the trial court must declare any bail forfeited." (*Id.* at p. 708.) The Court, after noting Bent had received notice of the pretrial hearing, did

10.

not execute a written waiver of his right to be present, and failed to appear without sufficient excuse, concluded "Bent's absence at this scheduled pretrial hearing constituted a basis on which to forfeit bail under section 1305." (*Id.* at p. 717.)

Here, as in *Safety National*, Brooks received notice of the pretrial hearing, did not execute a written waiver of his right to be present, and failed to appear without sufficient excuse. Accordingly, under *Safety National*, his nonappearance provided an adequate basis for the court's order forfeiting the bond.

*The May 7 Hearing*

Appellants next contend that the trial court lost jurisdiction when it refused to grant their request for exoneration of the bond at the May 7 hearing. They assert that it was impossible for them to surrender Brooks because Stanislaus County had placed a detainer on him while he was incarcerated in Oregon. They reason that this constitutes a "permanent disability" that required the trial court to exonerate the bond pursuant to section 1305, subdivision (d).

Section 1305 provides, in pertinent part, that in the case of a defendant's failure to appear because of a "permanent disability" due to "detention" by "civil authorities," the court "shall direct the order of forfeiture to be vacated and the bail . . . exonerated." (§ 1305, subd. (d).) Similarly, the statute provides, in pertinent part, that in the case of a defendant's failure to appear because of a "temporary disability" due to "detention" by "civil authorities," the court "shall order the tolling of the 180-day period provided in this section during the period of temporary disability" and thereafter tolling for a "reasonable period of time" to "allow for the return of the defendant to the jurisdiction of the court." (§ 1305, subd. (e).) "In either situation, whether the defendant's disability is permanent or temporary, there is a low threshold of proof. [Citation.] The disability need only be made apparent 'to the satisfaction of the court.' (§§ 1305, subds. (d), (e).)" (*People v. Lexington Nat. Ins. Corp.* (2010) 181 Cal.App.4th 1485, 1490 (*Lexington*).)

11.

Brooks' out-of-state incarceration constituted a statutory disability, as he was being detained by the Oregon authorities.  (*Lexington*, *supra*, 181 Cal.App.4th at p. 1492.)  The trial court was required to determine the appropriate relief based on the law and undisputed facts – either exoneration due to permanent disability or tolling due to a temporary disability.  (*Ibid.*)  The evidence before the trial court showed that Brooks' disability was temporary, as the district attorney was in the process of transporting him back to Stanislaus County and, in any event, he was scheduled to be released from OSP on September 10, at the earliest.  (*Id.* at pp. 1490-1491 [where defendant was incarcerated in Virginia, his disability was temporary to the extent he would be available for transfer to California after the conclusion of the out-of-state proceedings].)  Brooks' temporary disability required merely the tolling of the exoneration period for the duration of the disability "to allow for the return of the defendant to the jurisdiction of the court." (§ 1305, subd. (e).)

Appellants contend Brooks' disability was permanent because it was impossible for them to surrender Brooks as the district attorney was in the process of transporting him from Oregon to Stanislaus County.  We disagree.  The prosecutor, not the bail agent, has "the responsibility to bring to California a defendant incarcerated out of state to face justice here in California.  (§ 1305, subd. (f).)  The statutory scheme recognizes the prosecutor's authority to extradite a defendant found outside of California, and it requires the exoneration of bail if the prosecutor elects not to extradite.  (§ 1305, subds. (f), (g).) Specifically, 'in all cases where a defendant is in custody beyond the jurisdiction of the court that ordered the bail forfeited, and the prosecuting agency elects not to seek extradition after being informed of the location of the defendant, the court shall vacate the forfeiture and exonerate the bond. . . . ' (§ 1305, subd. (f).)" (*Lexington*, *supra*, 181 Cal.App.4th at p. 1491.)  Thus, where an out-of-state defendant is involved, the bond may be exonerated because the prosecuting agency elects not to seek extradition, not because the bail agent cannot bring the defendant to the California court.  Here, at the

time of the May 7 hearing, the prosecuting agency was in the process of, in effect, extraditing Brooks to California. Thus, there was no basis at the time of the May 7 hearing to exonerate the bond.

Appellants contend their performance was made impossible by agents of the state, and therefore the contract doctrine of impossibility (Civ. Code, § 1511) applied and required exoneration of the bond. Appellants cite three cases for this proposition: *People v. Meyers* (1932) 215 Cal. 115 (*Meyers*), *People v. American Surety Ins. Co.* (2000) 77 Cal.App.4th 1063 (*American Surety*), and *People v. National Automobile & Casualty Ins. Co.* (1979) 92 Cal.App.3d 481 (*National Automobile*). None apply.

In *Meyers*, our Supreme Court held that a bond should be exonerated because the bail agent would have to violate a court order in another county and thus be liable for contempt in order to do so. (*Meyers*, *supra*, 215 Cal. at p. 119.) In *American Surety*, the fugitive defendant was deported to Mexico and barred from reentering the United States for a drug offense conviction. The appellate court held that bail was exonerated under section 1305, subdivision (d), because the surety would have to violate federal criminal law in order to surrender the defendant, which made production of the defendant impossible. (*American Surety*, *supra*, 77 Cal.App.4th at pp. 1065-1067.)

Finally, in *National Automobile*, a California fugitive fled to Hawaii and the California district attorney refused to extradite him. The appellate court rejected the surety's contention that the district attorney's refusal to extradite rendered its performance impossible, as the surety was not prevented from sending an agent to Hawaii to arrest the defendant. (*National Automobile*, *supra*, 92 Cal.App.3d at p. 485.) The appellate court explained there was no legal authority for the proposition that the government's refusal to extradite a defendant from a foreign jurisdiction excused the surety's performance and exonerated the bond, unless "the government took some affirmative action which rendered the surety's obligation to have the defendant in court . . . an impossibility, such as the arrest or detention of the accused in another county

13.

before the surrender date[,]" citing *Meyers*. (*National Automobile*, *supra*, 92 Cal.App.3d at pp. 483-484.)

In contrast to *Meyers* and *American Surety*, where the surety's performance was rendered impossible by either court order or federal law, here performance was entirely possible because Brooks could be extradited from Oregon. And because he could be extradited, the state did not take any affirmative action which rendered appellants' obligation to have Brooks' presence in court rendered an impossibility.

*The May 26 Hearing*

Appellants raise several arguments concerning the trial court's May 26 order exonerating the bond on the condition of the payment of the costs of transporting Brooks to California.

Under section 1305, subdivision (c), there are several enumerated circumstances where the trial court, on its own motion, must vacate the forfeiture and exonerate the bond. As pertinent here, they include when the defendant appears voluntarily or in custody in court after surrender or arrest (§ 1305, subd. (c)(1)). In that circumstance, "the court shall, on its own motion at the time the defendant first appears in court on the case in which the forfeiture was entered, direct the order of forfeiture to be vacated and the bond exonerated. If the court fails to so act on its own motion, then the surety's or depositor's obligations under the bond shall be immediately vacated and the bond exonerated. An order vacating the forfeiture and exonerating the bond may be made on terms that are just and do not exceed the terms imposed in similar situations with respect to other forms of pretrial release." (*Ibid.*)

Section 1306(b) provides in pertinent part: "If a court grants relief from bail forfeiture, it shall impose a monetary payment as a condition of relief to compensate the people for the costs of returning a defendant to custody pursuant to Section 1305, except for cases where the court determines that in the best interest of justice no costs should be

14.

imposed. The amount imposed shall reflect the actual costs of returning the defendant to custody. . . ."

The parties agree that the trial court was obligated to vacate the forfeiture and exonerate the bond on Brooks' first appearance in Stanislaus County on May 26. Appellants, however, contend that the trial court did not act on its own motion when it exonerated the bond because it granted the district attorney's motion for costs. Appellants reason that because there is no statutory basis for the district attorney to bring a motion for costs, the motion, and the trial court's order granting it, are void and without effect. They assert that by the plain language of section 1305, subdivision (c)(1), the trial court did not act on its own motion and therefore the bond was exonerated by operation of law.

We disagree with appellants' characterization of the record. Although the district attorney made a written motion for costs pursuant to section 1306(b), it brought the motion in anticipation of the trial court executing its duty to vacate the forfeiture and exonerate the bond on Brooks' first appearance, not to exonerate the bond itself. Thus, when the trial court ordered the bond exonerated, it did so on its own motion. In so doing, it was required to "impose a monetary payment as a condition of relief to compensate the people for the costs of returning [Brooks] to custody[,]" unless it determined no costs should be imposed in the "best interest of justice." (§ 1306(b).)

The People contend the statute is silent on how the amount of costs to which they are entitled should be brought to the trial court's attention. Appellants disagree, pointing out that section 1306(b) provides that costs are imposed "if a court grants relief from forfeiture." Appellants assert that to preserve the cost issue, the district attorney should have filed an opposition to the trial court's own motion to exonerate Brooks' bond, in which it could have then made a request for costs, as the district attorney does not have a right to seek affirmative relief in a bail forfeiture proceeding. But that is precisely what the district attorney did. While the district attorney did not oppose exoneration, as it had

15.

no basis to do so, it filed a motion asking the trial court to award the costs to which the People were entitled under section 1306(b).

Appellants next complain that the district attorney's motion did not comply with Code of Civil Procedure section 1005, which applies to a list of motions, including "[a]ny other proceeding under this code in which notice is required and no other time or method is prescribed by law or by court or judge." (Code Civ. Proc., § 1005, subd. (a)(13).) Code of Civil Procedure section 1005, subdivision (b) requires all moving and supporting papers of such motions to be served and filed at least 21 court days before the hearing if the papers are served by mail. Appellants assert that this statute applies to the motion for costs, citing *People v. American Contractors Indemnity* (1999) 74 Cal.App.4th 1037, and contend the cost order should be reversed because the motion was mailed only five days before the May 26 hearing.

While appellants do not suggest that they did not know about the May 26 hearing, they assert that the district attorney's failure to comply with Code of Civil Procedure section 1005 deprived them of due process. They contend they were entitled to a fair opportunity to argue against an award of costs and to contest the factual basis for the amount claimed, and argue that we should decide, in the first instance, that costs should not have been imposed in the interest of justice and whether certain costs claimed, such as the officers' salaries, were appropriately awarded.

Appellants, however, never objected to any of these issues below by seeking reconsideration of the trial court's decision, which would have given them the opportunity to raise the late notice issue, and to contest the award and amount of costs. Because they did not do so, they may not now raise these issues on appeal. Issues that were not raised in the trial court, including constitutional issues, generally may not be raised for the first time on appeal. (*People v. Simon* (2001) 25 Cal.4th 1082, 1103 (*Simon*); *People v. Marchand* (2002) 98 Cal.App.4th 1056, 1060 ["Even a claim that [a party's] due process right to notice was violated may be waived by the failure to assert

16.

the claim in the trial court."].) The purpose of the forfeiture doctrine is to encourage a defendant to bring any errors to the trial court's attention so the court may correct or avoid the errors and provide the defendant with a fair trial. (*Simon*, *supra*, 25 Cal.4th at p. 1103.)

Moreover, appellants had actual notice at the May 7 hearing that the district attorney was processing the return of Brooks to Stanislaus County. Appellants were aware as of May 18 that Brooks would be returned to the county shortly and that the district attorney intended to ask the trial court for section 1306(b) costs on his first court appearance. At that time, appellants were provided with a breakdown of the estimated costs and advised to check with the superior court regularly to ascertain the date of Brooks' first court appearance. On May 21, the day the motion was filed, the district attorney investigator sent appellants an email advising them that Brooks had been returned to the county jail on May 20, providing the actual section 1306(b) costs, and stating that a motion for costs would be filed that day. As the People point out, appellants are engaged in a business regulated by the State of California, and employ counsel and other professionals who are quite capable of navigating the court system, and who were on equal footing with the district attorney as to when and where Brooks would be placed on calendar. To allow them to sit on their hands and do nothing does not serve the intent of the statutory framework of the bail statutes.

Finally, as the People point out, even if appellants' due process rights were offended, they consented to this treatment as part of the undertaking of bail. As requested by section 1287, the bond at issue here provides: "If the forfeiture of this bond be ordered by the Court, judgment may be summarily made and entered forthwith against the said The North River Insurance Company for the amount of its undertaking herein, as provided by Sections 1305 and 1306 of the Penal Code." "In cases involving bail forfeiture . . . the parties place great weight on the explicit consensual agreement to forfeiture; such consent is the fundamental basis of the bonding procedure and it is a

17.

condition which all bonding companies knowingly assume." (*People v. Beverly Bail Bonds* (1982) 134 Cal.App.3d 906, 910-911, fn. omitted.)

In this case, the provisions of section 1306 were followed. Accordingly, the trial court did not err.

## DISPOSITION

The trial court's orders are affirmed. Costs on appeal are awarded to respondent.


_____

GOMES, J.

WE CONCUR:


_____

HILL, P.J.


_____

KANE, J.